UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FELIX M. LOPEZ, JR.,

Plaintiff,

-against-

MARGARET RAMIREZ,

Defendant.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 0474 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a negligence action in which Plaintiff Felix M. Lopez, Jr. claims that – on

January 24, 2009 – he was struck by an automobile driven by Defendant Margaret Ramirez, and

suffered significant lower back injuries. On June 27, 2013, after a four-day trial, a jury returned

a Plaintiff's verdict, awarding Plaintiff $5,000 for future medical expenses. In reaching its

verdict, however, the jury determined that both parties were negligent; the jury found that

Defendant was 30% responsible for Plaintiff's injuries, and that Plaintiff was 70% responsible

for his injuries. (Verdict (Dkt. No. 48)) Accordingly, the Court entered judgment in favor of

Plaintiff in the amount of $1,500. (Judgment (Dkt. No. 49)) On January 10, 2014, Plaintiff

moved pursuant to Fed. R. Civ. P. 59, for a new trial. (Dkt. No. 58)

Plaintiff contends that he is entitled to a new trial because the Court

1. admitted portions of Plaintiff's November 2008 application for Social Security
   disability benefits, which was premised on lower back injuries Plaintiff allegedly
   sustained in an October 30, 2007 automobile accident that preceded the January 24,
   2009 accident at issue (see Pltf. Br. (Dkt. No. 58-1) at 12-15);

2. permitted Defendant to introduce (a) on cross-examination – as prior inconsistent
   statements – excerpts from the testimony of Plaintiff and one of Plaintiff's witnesses
   at a hearing concerning Plaintiff's claim for Social Security disability benefits; and
   (b) a letter submitted by Plaintiff's attorney concerning his application for Social
   Security benefits. Although both the testimonial excerpts and the letter concern

injuries Plaintiff allegedly sustained in the October 30, 2007 accident, Plaintiff asserts that the Court should have permitted him to introduce prior consistent statements concerning his January 24, 2009 accident (id. at 15-21);

3. the Court exhibited hostile and biased behavior toward Plaintiff and his witnesses, leading the jury to conclude that the Court did not believe Plaintiff's testimony and did not respect Plaintiff's counsel. (Id. at 21-22)[1]

## PROCEDURAL HISTORY

The Complaint was filed on January 24, 2011, and alleges that on January 24, 2009, Defendant Margaret Ramirez negligently struck Plaintiff Felix M. Lopez, Jr. with her vehicle while Lopez "was a pedestrian on the side of an exit ramp off the Bruckner Expressway in the Bronx, New York." (Cmplt. (Dkt. No. 1) at ¶¶ 5-6) Jurisdiction is premised on diversity of citizenship. (Id. at ¶ 3)

On June 24, 2013, the case proceeded to trial before a jury, and on June 27, 2013, the jury returned a verdict finding that Plaintiff Lopez had proven that Defendant Ramirez was negligent, and that Defendant's negligence was a proximate cause of Plaintiff's injuries. (Verdict (Dkt. No. 48)) The jury further concluded, however, that Defendant had proven "by a preponderance of the evidence that Mr. Lopez was negligent and that his negligence was a proximate cause of his own injuries." (Id.) The jury found Defendant Ramirez 30% at fault, and Plaintiff Lopez 70% at fault, and further found that – "ignoring any allocation of fault" – $5,000 would constitute fair compensation for Plaintiff's future medical expenses. (Id.) On June 28, 2013, the Court entered judgment in Plaintiff's favor in the amount of $1,500, reflecting the jury's determination as to comparative negligence. (Judgment (Dkt. No. 49))

---

[1] The page numbers of documents referenced in this Memorandum Opinion & Order correspond to the page numbers designated by this District's Electronic Case Filing ("ECF") system.

On September 30, 2013, Plaintiff moved for a new trial, pursuant to Federal Rule of Civil Procedure 59. (Mot. (Dkt. No. 52)) As noted above, Plaintiff claims that the Court made several erroneous evidentiary rulings, and argues that "[t]he trial record in this case is replete with partial and biased conduct and comments by the trial judge, including numerous accusatory, insulting and sarcastic comments about Plaintiff and his counsel in this case." (Dkt. No. 53)

Plaintiff's brief (Dkt. No. 53) did not contain any citations to the trial transcript. Moreover, the transcript was not available to the Court because it had not been ordered by the parties. "'Because [Plaintiff's] motion require[d] analysis of a . . . trial record and close attention to various witnesses' testimony, the Court conclude[d] that a transcript and transcript citations in the parties' memoranda of law [were] necessary.'" (Order (Dkt. No. 56) (quoting U.S. E. Telecom., Inc. v. U.S. W. Info. Sys., Inc., No. 87 Civ. 2924 (KTD)(THK), 1993 WL 385810, at *4 (S.D.N.Y. Sept. 30, 1993) aff'd sub nom. U.S. E. Telecom., Inc. v. U.S. W. Commc'ns Servs., Inc., 38 F.3d 1289 (2d Cir. 1994), and citing Hauf v. I.R.S., 968 F. Supp. 78, 82 (N.D.N.Y. 1997) (denying post-trial motion where "plaintiff's . . . brief provides no citations to, or portions of, the record" noting that "the Court is not willing to take [plaintiff's] word for the substance of . . . testimony, . . . [i]n the absence of specific citations to the testimony relied upon"); Raymo v. Textron, Inc., 846 F. Supp. 203, 206 (N.D.N.Y. 1994) (noting that "plaintiffs have failed to present a transcript of the actual [jury] charge" in their post-trial motion, and therefore the motion was denied because "the moving party has not furnished the Court with the appropriate records needed to review this issue")))

Accordingly, the Court denied Plaintiff's new trial motion without prejudice, and ruled that Plaintiff could "re-file his motion and a brief with appropriate citations to the trial transcript by October 31, 2013." (Id. at 2)

On January 10, 2014, Plaintiff filed a second new trial motion.[2] Although – in the interim – Plaintiff had arranged for a trial transcript to be prepared, Plaintiff's brief still does not contain any page citations to the trial transcript. (Pltf. Br. (Dkt. No. 58-1))

## BACKGROUND

## I. THE EVIDENCE AT TRIAL

### A. Plaintiff's Case

#### 1. Plaintiff's Testimony

Plaintiff Lopez – 50 years old at the time of trial – testified that he lives in Belleville, New Jersey with Donna Roman and her husband. (Trial Tr. ("Tr.") (Dkt. No. 61) at 90, 92)[3] On January 24, 2009, at about 4:30 a.m., he drove to the Bronx to pick up his girlfriend, Jeanine Ramdhani. (Id. at 92-93) Lopez was planning to drive her home to Corona, Queens. (Id. at 93)

After picking up Ramdhani, Lopez drove onto Bruckner Boulevard, hit something on the roadway, and heard his axle "pop[]." Lopez had difficulty steering his vehicle, and he exited the Bruckner at Exit 138, and pulled over to the side of the exit ramp. Lopez was driving a 14-foot long, 7,000-pound truck with four tires mounted on the rear axle, and the large truck extended substantially into the ramp's single lane of traffic. (Id. at 93, 96, 98-99, 103-04; Tr.

---

[2] On October 28, 2013, Plaintiff requested an extension of time to re-file the motion; this Court granted that request the same day. (See Dkt. No. 57)

[3] Lopez testified that he thinks of Roman as his "sister," but that she is not a blood relative. (Id. at 92) Roman testified that she and Lopez are "cousins." (Tr. (Dkt. No. 63) at 180)

4

(Dkt. No. 63) at 16, 33-34, 36) Cars traveling on the exit ramp were forced to slow down to safely pass Lopez's truck. (Tr. (Dkt. No. 61) at 101)

Lopez got out of his truck, leaving Ramdhani in the front passenger seat. (Id.) He walked to the middle front of his truck to inspect the damage, and confirmed that the axle was "all busted up," and saw that he also had a flat tire. (Id. at 102-03) He called Donna Roman, and asked her to arrange for a tow truck. (Id. at 102)

According to Lopez, while he was standing in front of his truck, he was "hit . . . twice" by Defendant Ramirez's passing vehicle. He "never seen her coming."[4] At the time, Lopez was eight feet in front of the middle of his truck, bent over looking under the front of his truck to see whether the oil tank had ruptured. (Id. at 105, 115; Tr. (Dkt. No. 63) at 12, 15, 36) According to Lopez, he was hit on his left side by the front passenger side of Ramirez's vehicle, was spun around by the impact, and then hit again by the passenger side mirror on Ramirez's vehicle on his right side.[5] (Id. at 106-07; Tr. (Dkt. No. 63) at 37). He was on the phone with Roman when he was hit, and dropped to the ground. (Id. at 108; Tr. (Dkt. No. 63) at 17))

According to Lopez, Defendant Ramirez stopped her vehicle, got out, and started yelling at him that he had broken her side mirror. She then said, "I gotta go," and drove away. (Id. at 109-10) Lopez did not tell Ramirez that he was injured. (Id. at 110) As Ramirez drove away, Lopez gave Roman – still on the telephone – the license plate number for Ramirez's car. (Id. at 111; Tr. (Dkt. No. 63) at 17) Lopez was still on the ground when Ramirez drove away.

___

[4] At a later point, Lopez testified that he was facing oncoming traffic when he was hit by Ramirez's vehicle. (Id. at 107-08)

[5] At his deposition, Lopez had testified that both impacts were on the left side of his body. (Tr. (Dkt. No. 63) at 42-43) Later in his trial testimony, Lopez testified that the side mirror hit the left side of his body. (Id. at 154) Then, based on leading questions from Plaintiff's counsel, Lopez changed his account yet again, returned to his earlier claim that Ramirez's car first hit his left side and then the side mirror hit his right side. (Id. at 155)

(Tr. (Dkt. No. 63) at 18) Lopez then got up, limped back to the truck, and told Ramdhani that Ramirez's vehicle had hit him. (Id. at 19)

Lopez went to an emergency room later that day, and was subsequently treated by his longtime chiropractor, Dr. Harry Maroulakos, and later by a pain management doctor. He felt pain in his left leg and "low back," and received injections for the pain. Lopez had never "experienced that type of pain before." Lopez then went to Dr. Marc Cohen for surgery. The surgery did not help his pain. Dr. Cohen told Plaintiff that he needed a "bigger operation." Lopez continues to suffer pain in his lower back and numbness in his leg. Lopez further testified that since the January 24, 2009 accident, he can't sleep, mow the lawn, wash his driveway, do repairs around his house, walk his dog, or play basketball. Since the 2009 accident, Lopez has suffered "excruciating pain," and his weight has ballooned from 275 pounds to 396 pounds. (Id. at 20-27, 30-31)

As to prior accidents, Lopez testified that another driver struck his truck in 2007, but that the accident was a "fender bender."[6] Lopez conceded, however, that the impact of the crash was sufficient to partially lift up his 7,000-pound truck. He suffered pain in his neck and "midback." Lopez did not recall whether he went to an emergency room that day, or what complaints he made to doctors that day about his pain. Lopez asserted, however, that he did not suffer lower back pain after the 2007 accident.[7] When asked to scale his pain from the two

---

[6] When questioned at his deposition about the October 30, 2007 accident, Lopez testified that he had no recollection of a car accident on that date. (Tr. (Dkt. No. 63) at 50)

[7] Lopez gave inconsistent testimony when asked whether he had ever suffered a lower back injury prior to the 2009 accident. He first testified that he had no lower back injury prior to the 2009 accident. (Tr. (Dkt. No. 63) at 48-49) He later testified that he had experienced lower back pain and pain running down his leg prior to the 2009 accident, but that it was "not that bad." (Id. at 51-52) Still later, Lopez testified that prior to the 2009 accident he had suffered pain in his "neck and midback." (Id. at 54)

6

accidents, Lopez that the pain he suffered after the 2007 accident was a "1," while the pain he

suffered after the 2009 accident was a "100." After the 2007 accident, Lopez obtained treatment

from a chiropractor, used heating pads, and received electrical stimulation. Lopez could not

recall whether he complained to his chiropractor about lower back pain and pain radiating into

his buttocks and leg at any point prior to the 2009 accident. Lopez also could not recall whether

he received regular chiropractor treatments from Dr. Maroulakos during the period between

October 2007 and January 2009. According to Lopez, he recovered from the injuries sustained

in the 2007 accident, and was able to return to mowing his lawn and doing painting, plumbing

and electrical repairs around his house. (Tr. (Dkt. No. 63) at 27-29, 49, 54-56, 58)

Lopez was cross-examined about a November 12, 2008 application he made to

the Social Security Administration ("SSA") for Social Security disability benefits and

Supplemental Security Income. Lopez's application was based on back injuries he sustained in

the October 30, 2007 motor vehicle accident. Lopez testified that although he had recovered

from the 2007 motor vehicle accident, he nonetheless applied for disability benefits. Donna

Roman helped Lopez complete his application for Social Security disability benefits. (Tr. (Dkt.

No. 63) at 65, 68, 70-71, 84) In his application, Lopez told SSA that had been disabled and

could no longer work as a result of the October 30, 2007 motor vehicle accident. The

information Lopez provided in his application was submitted under penalty of perjury. Although

Lopez admitted that he understood he was required to inform SSA if his back condition

improved, he said that he "forgot" to do so. Lopez could recall little other information that he

included in his application for disability benefits. (Id. at 66-67, 70-71)

Lopez's medical records from Dr. Maroulakos, his chiropractor that after the

October 30, 2007 accident – and before the January 29, 2009 accident – he complained about

"lower back pain radiating bilaterally into both buttocks." (DX J1 (November 26, 2007 medical records); DX J2 (December 26, 2007 medical records ("lumbar pain radiating into buttocks + thighs bilaterally. Said exacerbated [by] prolonged activities such as standing, sitting. . . ."); DX J3 ("Patient presented 6/30/08 with an occurrence of low back radiating into both legs"; Lopez had experienced "pain 2 weeks without provocation," and the pain was affecting his ability to stand and to bend over"). Medical records from Lopez's November 14, 2007 visit to the Clara Maass Medical Center state that Lopez is suffering lower back pain, and that he rates his pain as 8 on a scale of 10. (See DX I2)

In 2011, Lopez testified at a hearing before an SSA Administrative Law Judge ("ALJ") concerning his disability claim. Attorney Cheryl Gandel Mazur represented him for purposes of his disability claim. (Id. at 72) Audiotape excerpts from Lopez's testimony at the 2011 SSA disability claim hearing were introduced into evidence. (See DX N) At the 2011 SSA hearing, Lopez testified that in October 2007 another vehicle struck his truck with such force that it was lifted up in the air. As a result of the accident, Lopez sustained injuries to his "neck and back." Lopez testified that he "was in a lot of pain" after the October 30, 2007 accident, and that he experienced neck and back pain "every day." He could not sleep at night or get up in the morning. He was upset and "not himself," and found that he was always arguing with others. (Id. at 11:49:39 to 11:49:14)

On February 25, 2011, Lopez's counsel in the SSA proceeding sent a letter to the ALJ presiding over Lopez's disability claim. The letter contains the following discussion of Lopez's injuries from the October 30, 2007 motor vehicle accident:

> On October 30, 2007, the claimant was seen in the emergency room at Clara Maass Medical Center with complaints of back pain after a motor vehicle accident. He was diagnosed with back strain status post a motor vehicle collision. . . . Following the October 2007 motor vehicle accident, the claimant began

8

treating with Dr. Maroulakos with multiple rounds of physical therapy and chiropractic treatment. Progress notes indicate that the claimant complained of low back pain that radiated into both buttocks and hips that increased [with] activity. In June 2008, the claimant presented with an acute exacerbation of his low back pain and [he] continued therapy until December 2008.

(DX F1)

### 2.    Jeanine Ramdhani's Testimony

Jeanine Ramdhani testified that she was Lopez's girlfriend, and that she was in his truck at the time of the January 24, 2009 accident. (Id. at 158, 166) She confirmed that Lopez's truck broke down and that "[h]e pulled over right when we got off the exit. . . ." (See Tr. (Dkt. No. 63) at 158-59) Lopez stepped out of the truck to see what was wrong. Ramdhani did not see Ramirez's car hit Lopez, but she testified that Lopez was in front of his truck when he was hit. Lopez fell to the ground. When he got up, he was holding his back. She heard Ramirez say, "you hit my car," and Lopez say, "Lady, you hit me." Ramirez then drove away. Lopez did not threaten Ramirez or scream at her. (Id. at 158-61)

Although Ramdhani claimed that she observed Lopez on the ground, she never got out of the truck to see whether he was hurt. (Id. at 166)

### 3.    Donna Roman's Testimony

Donna Roman testified that she is Lopez's cousin and has lived with him for 24 years. She has been his caregiver since 2009. (Id. at 169-70, 180) She testified that, after the 2007 accident, Lopez suffered neck and "midback" pain, but eventually recovered. He was "very active" after the 2007 accident: he walked his dog, played tag football, did his own chores, and was "not dependent on anyone for any assistance physically with anything." (Id. at 177-79, 188, 211)

After the 2009 accident, Lopez had difficulty walking, climbing stairs, getting out of bed, and sleeping, and was in constant pain. He became very dependent on Roman. (Id. at 176)

Roman testified that she filled out Lopez's online SSA disability application, but that Lopez supplied the information she typed in. She could not recall the information she input. For example, she could not recall whether she listed a disability onset date of October 31, 2007. Roman also couldn't recall what was said in a conference call between SSA, Lopez and herself about Lopez's disability benefits application. Although Roman brought Lopez to his appointments with his chiropractor, Dr. Maroulakos, Roman could not provide any information as to when she brought Lopez to his appointments. Although she admitted that Lopez told her that he couldn't stand or sit for long periods of time because of pain, she resisted provided any time frame in which he made these complaints. (Id. at 181-90, 213) Roman also could not recall any conversation she had with Lopez about the 2007 accident (id. at 192), even though she was living with him at the time. Similarly, she refused to answer questions about whether Lopez was able to work after the 2007 accident, even though she saw him on a daily basis and was living with him. (Id. at 193)

Roman was cross-examined about her testimony at Lopez's SSA disability claim hearing on March 1, 2011. (Id. at 193) At that hearing, Roman testified that Lopez was in a "lot of pain" after the October 30, 2007 accident. Although chiropractic treatment provided Lopez with "interim relief," "he was in a lot of pain," and she witnessed Lopez "debilitate" on days that he did not receive chiropractic treatment. Lopez struggled to get in and out of bed and to shower. Roman installed a handicap bar in the shower and made other "enhancements" in the home to assist Lopez. At two points during her SSA hearing testimony, Roman stated that Lopez

"could not have worked" after the first accident. (DX N at 12:06:37 to 12:07:17; 12:07:42 to 12:07:55; 12:08:30 to 12:08:53)

### 4. Dr. Marc Cohen's Testimony

Dr. Marc Cohen, an orthopedic surgeon and Lopez's treating physician testified at trial. (Tr. (Dkt. No. 63) at 106-07) Dr. Marc Cohen's records reveal that on June 9, 2009, Lopez had told him that he had a "back problem three years ago for which he received only chiropractic care. He did well, was able to return to work."[8] (Id. at 108-09) Dr. Cohen concluded that Lopez had a herniated disk in the lowest part of the spine, and that the herniation had been caused by a traumatic event, such as a car accident, and was not degenerative. (Id. at 119, 120-22, 123) On August 20, 2009, Dr. Cohen performed minimally invasive surgery on Lopez, and removed the herniation. Lopez improved initially, but his pain recurred. Cohen then recommended fusion surgery. (Id. at 124-27)

Dr. Cohen agreed that Lopez's back condition could have been caused by the 2007 accident. Moreover, Dr. Cohen testified that Lopez did not tell him that (1) he had applied for SSA disability benefits two months before the January 24, 2009 accident; and (2) never returned to work after the October 30, 2007 accident. Indeed, Lopez told Dr. Cohen that he had returned to work "full duty" after the 2007 accident. (Id. at 142, 152)

---

[8] Dr. Cohen's records are not consistent on the issue of whether Lopez had reported a prior back injury. At another point in his records concerning the June 9, 2009 appointment, Dr. Cohen states that Lopez told him that he had no prior injury. (Id. at 133) Similarly, Dr. Cohen's records from a February 12, 2010 office visit report that Lopez "states that he had no back issues prior to the [January 24, 2009] accident." (Id. at 136; DX L) Dr. Cohen testified that each of these entries was a "typo." (Id. at 133, 136)

11

**B.    Defense Case**

**1.    Margaret Ramirez's Testimony**

Ramirez is a married mother of two who has worked for the Social Security Administration for 32 years. On January 24, 2009, she was driving in her 1997 Mazda Protégé to her office on 146th Street. (Tr. (Dkt. No. 65) at 3, 41) She took the 138th Street exit off the Bruckner. Traffic was not moving on the exit ramp, because Lopez's truck was parked midway down the ramp, and was obstructing the single lane of traffic on the exit ramp. She observed Lopez standing by the front left corner of his truck. He was on the phone. As she proceeded down the ramp, Lopez was bending down near the left front corner of the truck, near the tire. There were tools on the ground in front of the truck. As Ramirez's vehicle passed Lopez, she veered to the left to avoid him. At the moment that Ramirez was passing Lopez, however, he stepped back further into the traffic lane, and she heard her passenger side mirror slap against the passenger side window. The side mirror on her Mazda collapses onto the side passenger window when it "hit[s] something." Realizing that her side mirror had hit Lopez, Ramirez pulled over to the side of the road. Lopez did not fall to the ground as a result of being clipped by the side mirror, nor was he spun around by the impact. (Id. at 5-8, 11-12, 15, 17-21, 23-24, 27, 29-30, 31, 36-38, 43)

After pulling over to the side of the road, Ramirez got out of her car, approached Lopez, and asked him whether he was okay. He was still on the phone "screaming" at someone and initially ignored her. After a few minutes, he said to her, "You hit me." Ramirez responded that he had stepped back into her car. Ramirez then walked back to her car. She returned to Lopez, however, and asked whether he was okay. Lopez was still "screaming" into his phone. He then told Ramirez, "get the fuck out of here." When she hesitated, he picked up a silver-

12

colored tool from the ground and came towards her, waving it in his hand. Ramirez became fearful, returned to her car, and drove away. Lopez never gave any indication that he had been injured; indeed, he never got off the phone and never stopped pacing back and forth. The only damage to Ramirez's car was to her side mirror, which had to be folded back into its track; a screw was inserted to complete the repair. (Id. at 8-11, 31-33, 35)

## 2. Evelyn Beltran's Testimony

Beltran works with Ramirez at the SSA. On the morning of January 24, 2009, she was also driving to work on the Bruckner. She took the 138th Street exit and observed Lopez's truck broken down on the side of the ramp and saw him standing beside it. The exit ramp is one lane, and there was barely room to pass by Lopez's truck. She had to veer left to avoid him. (Id. at 56-59)

## 3. Medical Testimony

Dr. Stephen Lastig, a radiologist, examined an MRI study of Lopez – including scans of his lumbar spine – conducted in March 2009, two months after the January 24, 2009 accident. (DX O) Dr. Lastig testified that Lopez has degenerative disc disease – in other words, he suffers from "the wear and tear of the disc from activities of daily living, occupation, or . . . age." (Id.)

Dr. Lastig described two abnormalities apparent from the MRI images of Lopez's lumbar spine: desiccation of the lumbar discs, and a mild loss of disc height. These abnormalities, Lastig testified, "are . . . two of the hallmarks of degenerative disc disease." (Id.) Lastig also testified that he observed disc herniation, but that the herniation was "not deforming, touching, or displacing nerve structures." (Id.)

13

Dr. Lastig further testified that he saw no evidence of a traumatic injury, and explained that the indicators of such an injury – including fractures, bone contusions, and bruising – were absent. Although in certain circumstances an acute herniation can constitute evidence of a traumatic injury, the herniation Dr. Lastig observed in Lopez's MRI would not have arisen during the two-month period between the January 24, 2009 accident and the March 2009 imaging study. The herniation was instead the long-term manifestation of degenerative disc disease. (Id.) Accordingly, Dr. Lastig opined that the January 24, 2009 motor vehicle accident did not cause Lopez to suffer a traumatic injury.

Defendant also called Dr. Isaac Cohen, an orthopedic surgeon. He examined Lopez on January 8, 2013, took a medical history, and reviewed Lopez's medical records. (Tr. (Dkt. No. 65) at 70, 73-75) During the medical history, Lopez told Dr. Cohen that he had not suffered any previous injuries to his back. Dr. Cohen opined that Lopez suffers from longstanding degenerative disc disease that took years to develop and which pre-existed the 2009 accident. (Id. at 76, 77-78, 84, 89, 96, 102)

In support of his opinion, Dr. Isaac Cohen cited, inter alia, records from Lopez's emergency room visit shortly after the October 30, 2007 accident. The ER records state that Lopez had been in a car accident and was suffering from back pain. Lopez told the ER doctors in 2007 that he was experiencing lower back pain that rated 8 on a pain scale of 10. Dr. Cohen also reviewed records of Lopez's chiropractor, who treated him from 2007 up to just a few weeks before the January 2009 accident. The chiropractor's records show that Lopez had a "long history of preexisting pathology." While Dr. Isaac Cohen agreed with Dr. Marc Cohen that Lopez had suffered an annular tear, Dr. Isaac Cohen pointed out that it is impossible to determine when Lopez suffered this tear, in part because most annular tears and herniated discs

14

are asymptomatic. (Id. at 81-83, 99, 109, 112) Dr. Cohen also cited records from Lopez's MRI, which revealed no acute traumatic episode involving the spine, but instead showed only degenerative disc disease. (Id. at 109-10)

As to the 2009 accident, Dr. Isaac Cohen concluded that Lopez suffered no injury on that day. The ER records indicate that the hospital merely took an x-ray of Lopez's hip and pelvis, presumably because that is where the side mirror hit him. While the 2009 accident may have temporarily exacerbated Lopez's degenerative disc condition, it did not cause the condition. (Id. at 84, 97, 102, 113)

On cross-examination, Plaintiff's counsel asked Dr. Isaac Cohen to comment on Dr. Marc Cohen's findings. Dr. Isaac Cohen noted that Dr. Marc Cohen had been under the false impression that Lopez – after the October 30, 2007 accident – had been able to return to work "full duty," whereas Lopez had actually not been able to return to work at all. Moreover, Dr. Marc Cohen was not aware that Lopez had been consistently under chiropractic care during the entire period between the 2007 accident and the 2009 accident, which indicated that Lopez was suffering back pain throughout this period. (Id. at 104, 105-106) Dr. Isaac opined that these factors would have likely influenced Dr. Marc Cohen's opinion.[9] (Id. at 112-13)

## C.    Credibility Findings

Lopez was not a credible witness, either as to what happened on January 24, 2009, or as to the October 30, 2007 accident and his disability claim premised on injuries sustained in that accident.

---

[9] Dr. Isaac Cohen also noted that certain of Dr. Marc Cohen's records reported that Lopez had stated that he had suffered no back issues prior to the 2009 accident. (Id. at 111 (discussing DX L1))

As to the 2009 accident, Lopez testified that he was standing in front of the middle of his large truck at the time he was hit, but if that were true Ramirez's vehicle – which was passing to the left of Lopez's truck – would never have hit Lopez. His inconsistent accounts of being hit twice by Ramirez's vehicle were entirely implausible.

As to whether his back condition was due to the October 2007 accident or the January 2009 accident, Lopez's medical records and his SSA disability claim – which was premised on the October 2007 accident and an assertion that Lopez had never been able to return to work after that accident – entirely undermined his claim that he had fully recovered from the October 2007 "fender bender" before the "life altering" January 2009 accident. Lopez's medical records and his lawyer's letter to the SSA ALJ demonstrate that Lopez suffered a significant back injury during the October 2007 accident, from which he continued to experience pain throughout 2007 and 2008, and for which he continued to receive treatment until December 2008 – one month before the January 2009 accident. Accordingly, Lopez's claim that his back pain was due entirely to the January 2009 accident was not credible.

Ramdhani's testimony added little, because she claimed she did not see the accident – even though she was seated in the front passenger seat of Lopez's truck, only feet away from where he was standing at the time of impact. And Ramdhani's admission that she never bothered to get out of the truck to offer assistance to Lopez after he was allegedly struck by Ramirez's vehicle undermined Lopez's claim that he had been violently knocked to the ground.

Roman was not at the scene of the accident, and her testimony about Lopez's alleged full recovery from the 2007 accident was not credible. Roman could recall nothing about the SSA disability application she completed for Lopez; nothing about what was said in the

16

conference call with SSA; nothing about what was said at Dr. Maroulakos' office when she brought Lopez there for chiropractic treatment; and nothing about what Lopez said to her about the 2007 accident, even though they were living together at the time. She also refused to answer questions about whether Lopez was able to work after the 2007 accident, even though (1) she saw him on a daily basis; and (2) she testified at the SSA hearing that after the 2007 accident Lopez "could not have worked." Her testimony at trial about Lopez's condition after the 2007 accident thus directly contradicted her testimony at the 2011 SSA hearing. In sum, Roman was an evasive witness who appeared to be slanting her testimony to support Lopez's claim.

Ramirez, by contrast, was an entirely credible witness, and her account of the sequence of events on January 24, 2009 makes sense. Given that Lopez's 7000 pound, 14-foot truck was blocking half of the exit ramp – a fact confirmed by Beltran – it makes sense that traffic slowed down when it reached the area where his disabled truck was parked. Given the slow passage of traffic, Ramirez had ample time to observe Lopez, and her testimony that she carefully veered left to pass him makes sense. Contrary to Lopez's testimony that he was standing in front of the middle of his truck, Lopez must have been standing near the front driver's side tire, as Ramirez testified, because otherwise Ramirez's side mirror would not have "clipped" Lopez. The Court also accepts Ramirez's testimony that the side mirror struck Lopez because he stepped back further into the traffic lane just as she passed. Lopez was angry, "screaming" on the phone, and not paying attention to the passing cars. Given that the side mirror folded in when it met resistance, the impact to Lopez would have been slight. The Court accepts Ramirez's testimony that he was not knocked down, and continued his phone call uninterrupted. The Court also accepts Ramirez's testimony that Lopez was angered by her approach, told her to "get the fuck out of here," and became threatening when Ramirez did not

17

immediately comply. Given that Lopez was six foot, six inches tall and 275 pounds (Tr. (Dkt. No. 63) at 31), the Court has no difficulty in accepting Ramirez's testimony that she found his angry demeanor threatening.

Although Dr. Marc Cohen's testimony supported Lopez's claim that the 2009 accident had caused a traumatic injury to his back, the weight of his opinion was undermined by (1) evidence indicating that Lopez had told him at several points that he had never suffered a back injury prior to the January 24, 2009 accident; and (2) his failure to review all of the records from Lopez's chiropractor, which repeatedly state that Lopez was experiencing lower back pain during the period between the October 30, 2007 accident and the January 24, 2009 accident.

By contrast, Defendants' medical experts – Dr. Lastig and Dr. Isaac Cohen – were entirely credible. Dr. Isaac Cohen noted that Lopez had told him that he had not suffered any prior injury to his back before the January 24, 2009 accident, and that this assertion was flatly contradicted both by Lopez's emergency room records on October 30, 2007, and by the records of his chiropractor. Dr. Isaac Cohen also noted that Dr. Marc Cohen was under the false impression that Lopez had been able to return to work "full duty" after the October 30, 2007 accident, when in fact, he had not been able to return to work at all. Finally, Dr. Lastig and Dr. Isaac Cohen credibly testified that Lopez's back condition was caused by degenerative disc disease that had preceded the January 24, 2009 accident.

## II.    JURY VERDICT

After a little more than two hours of deliberation – including the lunch hour – the jury returned its verdict. The jury concluded that Ramirez had been negligent and that her negligence had caused injury to Lopez. (Verdict (Dkt. No. 48); Tr. (Dkt. No. 67) at 123-24) The jury further concluded, however, that Lopez had been negligent, and that his negligence had been

18

a "proximate cause of his own injuries." (Verdict (Dkt. No. 48) Tr. (Dkt. No. 67) at 124)
According to the jury, Lopez was 70% at fault, which Ramirez was 30% at fault. (Id.) The jury
further concluded that Lopez had not shown that he sustained a "serious injury" as the result of
the January 24, 2009 action. (Id.) As to damages, the jury awarded Lopez $5000 for future
medical expenses and nothing for pain and suffering. Because Lopez was 70% responsible for
the injuries he suffered on January 24, 2009, the $5000 award was reduced – in the Judgment –
to $1500. (Verdict (Dkt. No. 48); Tr. (Dkt. 67) at 124-25; Judgment (Dkt. No. 49))

The jury's verdict is entirely consistent with the credibility determinations
discussed above. The jury appears to have accepted Ramirez's testimony that (1) Lopez stepped
back further into the traffic lane, and thus was 70% responsible for any injury that he sustained;
(2) Lopez had not been knocked down by his encounter with the side mirror, and had not
sustained any serious injury; and (3) to the extent that Lopez was suffering back pain, it was
attributable to the October 30, 2007 accident and not the January 24, 2009 accident.

## DISCUSSION

### I. LEGAL STANDARDS

"Rule 59 of the Federal Rules of Civil Procedure permits a court, on motion, to
'grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new
trial has heretofore been granted in an action at all in federal court.'" Springer v. Cedro, 894 F.
Supp. 2d 474, 481 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)). "The decision to grant
a new trial pursuant to Rule 59(a) is committed to the sound discretion of the trial judge."
Livingston v. Escrow, No. 08 Civ. 6576 (FPG), 2014 WL 1466469, at *2 (W.D.N.Y. Apr. 15,
2014) (citing Sequa Corp. v. GBJ Corp., 156 F. 3d 136, 143 (2d Cir. 1998)). In order for the
Court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a
seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, i.e., it must view the

19

jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotations and citations omitted). "Accordingly, '[o]n a motion for a new trial, the moving party bears [a] heavy burden.'" Prendergast v. Pac. Ins. Co., No. 09 Civ. 6248 (MWP), 2013 WL 5567656, at *5 (W.D.N.Y. Sept. 25, 2013) (quoting Manes v. Metro-North Commuter R.R., 801 F. Supp. 954, 956 (D. Conn. 1992), aff'd, 990 F.2d 622 (2d Cir. 1993)). "Furthermore, 'Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"" Kogut v. Cty. of Nassau, No. 06 Civ. 6695 (JS) (WDW), 2012 WL 3820826, at *2 (E.D.N.Y. July 22, 2013) (quoting O'Connell v. Onondaga Cty., No. 09 Civ. 0364 (FJS) (ATB), 2013 WL 998598, at *1 (N.D.N.Y. Mar. 13, 2013)).

"[A] new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and . . . a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[10] Manley, 337 F.3d 237 at 244-45 (internal quotation marks and citation omitted). In weighing the evidence, however, the Court "should not ordinarily ignore the jury's role in resolving factual disputes" and in assessing witness credibility. MacMaster v. City of Rochester, No. 05 Civ. 06509 (JWF), 2009 WL 63045, at *6 (W.D.N.Y. Jan. 6, 2009). "Here, the Court was the trial Court that heard the case, therefore, it sits in the 'unique position to assess the credibility of the witnesses and to determine the weight which should be accorded their testimony.'" Ullman v. Starbucks Corp.,

---

[10] In some cases, the Second Circuit has stated that, in ruling on a Fed. R. Civ. P. 59 motion for a new trial, it will "view the record in the light most favorable to . . . the party against whom a new trial is sought." Kerman v. City of New York, 374 F.3d 93, 122 (2d Cir. 2004) (citing cases). The prevailing rule, however, is the standard set forth in Manley v. AmBase Corp., 337 F.3d 237 (2d Cir. 2003). See 11 Wright, Miller & Kane, Federal Practice & Procedure § 2806 (2d ed.1995) (in deciding a Rule 59 motion, "[t]he judge is not required to take that view of the evidence most favorable to the verdict-winner").

152 F. Supp. 2d 322, 326 (S.D.N.Y. 2001) (quoting Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). "However, 'trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his . . . assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.'" Springer, 894 F. Supp. 2d at 482 (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012)). "[A] trial court should be most reluctant to set aside that which it has previously decided unless convinced that it was based on a mistake of fact or clear error of law, or that refusal to revisit the earlier decision would work a manifest injustice." Libutti v. United States, 178 F. 3d 114, 118 (2d Cir. 1999). "The unsuccessful party's disagreement with the court's decisions or conclusion is insufficient to obtain relief under Rule 59." Ullman, 152 F. Supp. 2d at 326 (citing Farr Man Coffee, Inc. v. Chester, No. 88 Civ. 1692 (DNE), 1993 WL 328854, at *1 (S.D.N.Y. Aug. 26, 1993)).

"Trial courts have substantial discretion in the admission of evidence." Health Alliance Network, Inc. v. Cont'l Cas. Co., 245 F.R.D. 121, 129 (S.D.N.Y. 2007) aff'd, 294 F. App'x 680 (2d Cir. 2008) (citing Parrish v. Sollecito, 280 F. Supp. 2d 145, 165 (S.D.N.Y. 2003)). "Evidentiary rulings cannot be the basis of a new trial unless affirmance would deny substantial justice." Id. (citing Am. Nat'l Fire Ins. Co. v. Mirasco, Inc., 451 F. Supp. 2d 576, 584 (S.D.N.Y. 2006))

In order for evidentiary errors to form the basis for a new trial, the standard of Fed. R. Civ. P. 61 must be met:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to

21

take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Am. Nat'l Fire Ins. Co., 451 F. Supp. 2d at 584 (quoting Fed. R. Civ. P. 61 (2006 ed.), and citing Perry, 115 F.3d at 150 ("[E]ven an erroneous evidentiary ruling will not lead to reversal unless affirmance would be inconsistent with substantial justice." (internal quotation marks omitted)) "The Second Circuit has clarified that a substantial right has been affected only where a jury's judgment was likely to have been 'swayed by the error.'" Id. at 584-85 (quoting Parrish, 280 F. Supp. 2d at 165).

## II.     ADMISSION OF PRIOR INCONSISTENT STATEMENTS FROM PLAINTIFF'S SOCIAL SECURITY DISABILITY PROCEEDING

Plaintiff contends that the Court committed reversible error by "permit[ting] repeated reference to, and evidence (both testamentary and documentary) from, a [S]ocial [S]ecurity disability claim brought by Plaintiff." (Pltf. Br. (Dkt. No. 58-1) at 6, 12-15)  Plaintiff never explains what material from Plaintiff's Social Security disability claim proceedings was introduced at trial, however.

In reality, at Plaintiff's request (Pltf. MIL Br. (Dkt. No. 44)) and over Defendant's objection, the Court excluded almost all documentary material from Plaintiff's Social Security disability claim, including his application for disability benefits, summaries of that claim prepared by the SSA, and the ALJ's ruling on Plaintiff's disability claim. (Tr. (Dkt. No. 63) at 4-7, 59-63; (Dkt. No. 65) at 120-21)[11]  The Court ruled, however, that to the extent that Plaintiff and Roman sought to minimize at trial the injuries Lopez sustained in the October 30, 2007

---

[11] Although Plaintiff's counsel had moved in limine to exclude the SSA ALJ's determination concerning Lopez's disability claim (Pltf. MIL Br. (Dkt. No. 44) at 3-16), and the Court granted that application (Tr. (Dkt. No. 63) at 58-59), at a later point in the trial Plaintiff's counsel suggested in passing that he wanted to introduce that determination. (Tr. (Dkt. No. 63) at 64)

accident, or asserted that Lopez had recovered from the October 30, 2007 accident before the January 24, 2009 accident, they could be cross-examined with inconsistent statements they made at the March 1, 2011 SSA disability claim hearing. (Tr. (Dkt. No. 61) at 45, 47; Tr. (Dkt. No. 63) at 3-4, 7, 58-64; DX N)

The Court also ruled that – if Plaintiff sought to minimize the injuries he sustained from the October 30, 2007 accident – Defendant could introduce – as an agent admission – an excerpt from a February 25, 2011 letter Plaintiff's counsel had submitted to the SSA ALJ concerning the "low back pain" Lopez had experienced after the October 30, 2007 accident and the course of physical therapy and chiropractic treatment he had received between October 2007 and December 2008 to address "low back pain that radiated into both buttocks and hips." (DX F1; see also Tr. (Dkt. No. 61) at 18-19; Tr. (Dkt. No. 65) at 121-23) The Court ruled that the lawyer's letter is an admission, because Plaintiff's counsel "was clearly Mr. Lopez's agent for purposes of pursuing his claim with the Social Security Administration." (Tr. (Dkt. No. 65) at 121-22) With respect to Fed. R. Evid. 403, the Court found that the excerpt from the lawyer's letter "is highly relevant here in light of [P]laintiff's decision to put into dispute the seriousness of the October 30, 2007 incident and the injuries that were sustained at that time." (Id. at 122-23)[12]

---

[12] While Plaintiff now contends that his lawyer's letter to the SSA ALJ was not an admission and constitutes hearsay (see Pltf. Br. (Dkt. No. 58-1) at 17), under Fed. R. Evid. 801(d)(2)(D) it is clear that Lopez's lawyer was in fact his agent for purposes of his SSA disability claim, and that admissions of this sort are not hearsay by definition. See Fed. R. Evid. 801(d)(2)(D).

"Statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." United States v. Margiotta, 662 F.2d 131, 142-43 (2d Cir. 1981) (citing Fed. R. Evid. 801(d)). "In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient foundation by establishing '(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.'"

The Court further ruled that Plaintiff could not introduce prior consistent statements made by Lopez concerning the 2009 accident, because these statements had no bearing on Lopez's prior inconsistent statements concerning the injuries associated with, and recovery from, the October 30, 2007 accident. (Tr. (Dkt. No. 61) at 47, 49; Tr. (Dkt. No. 63) at 7-10; Tr. (Dkt. No. 65) at 124-25)

In his opening, Plaintiff's counsel – Matthew A. Peluso – sought to minimize the injuries that Lopez sustained in the October 30, 2007 accident, asserting that that accident was a minor "fender bender." (Tr. (Dkt. No. 61) at 82) In his direct examination, Lopez testified that he suffered only minor back pain after the October 30, 2007 accident; fully recovered from his injuries; and was able to perform all his usual activities, including mowing the lawn, fixing concrete, cleaning his driveway and windows, and painting, plumbing and electrical work. (Tr. (Dkt. No. 63) at 28- 29) During Roman's direct testimony, she also minimized Lopez's injuries from the October 30, 2007 accident, and claimed that he had fully recovered before the January 24, 2009. Roman testified that Lopez was "feeling better" and "improved" after the 2007 accident, and "was very active" after that accident, noting that he walked his dog, played flag football, did all his chores, and was "not dependent on anyone for any assistance with anything." (Id. at 176-79) As noted above, when cross-examined about Lopez's condition after the 2007

---

Marcic v. Reinauer Transp. Companies, 397 F.3d 120, 128-29 (2d Cir. 2005) (quoting Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1999)). "The Second Circuit has held that admissibility under this rule should be granted freely." Rich v. Tee Bar Corp., No. 10 Civ. 1371 (MAD) (CFH), 2013 WL 5442277, at *10 (N.D.N.Y. Sept. 27, 2013).

Here, there is no dispute that (1) the lawyer who wrote the letter to the SSA ALJ was Plaintiff's lawyer for purposes of his SSA disability claim; (2) that the letter was written during the course of her representation of Lopez; and (3) that the letter relates to a matter within the scope of the agency relationship. (Tr. (Dkt. No. 61) at 18-19; Tr. (Dkt. No. 65) at 122-23)

accident, Roman could recall almost no relevant facts, including the disability claim she filed for Lopez. (See, e.g., id. at 181-93)

Given these circumstances, the Court properly admitted evidence of Lopez and Roman's prior inconsistent testimony concerning the injuries Lopez sustained in the October 30, 2007 accident and his condition thereafter. Lopez's prior testimony clearly constitutes an admission under Fed. R. Evid. 801(d)(2)(A); see also United States v. Hale, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). Roman's prior inconsistent testimony was admissible under Fed. R. Evid. 613. The purpose of this evidence was clearly explained to the jury in the Court's jury instructions:

> You've heard evidence that Mr. Lopez applied to the Social Security Administration for disability benefits. You will not be asked to determine whether Mr. Lopez is disabled. A different standard applies to the disability determination and it is irrelevant what determination the Social Security Administration made concerning Mr. Lopez's application. Evidence concerning Mr. Lopez's claim for disability benefits was admitted so that you could consider statements Mr. Lopez and Ms. Roman made about Mr. Lopez's condition after October 30, 2007 car accident. As with all other evidence you heard, the weight you give this evidence is entirely up to you.

(Tr. (Dkt. No. 67) at 109-110)

Plaintiff has not cited any law suggesting that the Court erred in admitting (1) Lopez and Roman's inconsistent testimony, and (2) Lopez's lawyer's letter describing the injuries he sustained and the pain he suffered between the October 30, 2007 accident and the January 24, 2009 accident. To the extent that any cogent legal argument can be teased out of Plaintiff's motion for a new trial, he appears to argue that this Court violated New York's "collateral source" rule.

25

## A. Plaintiff's Arguments Concerning the Collateral Source Doctrine

Plaintiff argues that under New York law, "evidence from any collateral source, including social security disability benefits, is inadmissible at trial in a personal injury action." (Pltf. Br. (Dkt. No. 58-1) at 13) (emphasis in original) (citing Tipton v. Socony Mobil Oil Co., Inc., 375 U.S. 34, 35, 37 (1963); Eichel v. New York Central Railroad Co., 375 U.S. 253, 254-55 (1963)).

"New York's common-law collateral source rule generally precludes a defendant from offering evidence that a plaintiff is being reimbursed by another source (to which the defendant has not contributed), or from seeking an offset on that basis." Turnbull v. USAir, Inc., 133 F.3d 184, 186 (2d Cir. 1998). "The collateral source doctrine 'is an established exception to the general rule that damages in a negligence action must be compensatory.'" Rofail v. United States, No. 04 Civ. 2502 (CBA), 2009 WL 1703236, at *13 (E.D.N.Y. June 18, 2009) (quoting Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 316 (2d Cir. 1964)). "Under this exception, 'a wrongdoer is not permitted to reduce a plaintiff's recovery because of benefits which the latter may have received from another source.'" Id. (quoting Cunningham, 333 F.2d at 316, and citing Davis v. Odeco, 18 F.3d 1237, 1243 (5th Cir. 1994)).

"The rational for the rule arose out of concern that allowing the introduction of collateral sources of income would influence juries in their determination of a tortfeasor's liability." King v. City of New York, No. 06 Civ. 6516 (SAS), 2007 WL 1711769, at *1 (S.D.N.Y. June 13, 2007) (citing Phillips v. Western Co. of N. Am., 953 F.2d 923, 929 (5th Cir. 1992)). "It has long been recognized that evidence showing that the defendant is insured creates a substantial likelihood of misuse." Eichel, 375 U.S. at 255. "The collateral source rule addresses this potential bias and effectively forces the tortfeasor to absorb the total cost of the

26

resulting harm." King, 2007 WL 1711769, at *1. The admission of evidence of collateral source benefits may constitute grounds for a new trial. See Eichel, 375 U.S. at 255-56.

The collateral source doctrine has no application here, because the Court admitted no evidence of the SSA's determination concerning Lopez's disability claim, much less evidence of the disability benefits Plaintiff had received.[13]

*     *     *     *

The Court's admission of (1) Lopez and Roman's prior inconsistent testimony concerning the injuries Lopez sustained from the October 30, 2007 accident, and his recovery from those injuries; and (2) Lopez's lawyer's analysis of those injuries and Plaintiff's recovery, provide no basis for granting Plaintiff's new trial motion.

## III.  PLAINTIFF'S PROFFER OF "PRIOR CONSISTENT STATEMENTS" AND THE RULE OF COMPLETENESS

Plaintiff contends that because the Court permitted Defendant to introduce Lopez and Roman's prior inconsistent statements concerning the injuries Lopez sustained from the October 30, 2007 accident, and his recovery from those injuries, the Court was required – under the Rule of Completeness – to permit Plaintiff to introduce prior consistent statements of Lopez and Roman concerning the January 24, 2009 accident, and the injuries Plaintiff sustained at that time. (See Pltf. Br. (Dkt. No. 58-1) at 15-21)

### A.  Applicable Law

"Under Federal Rule of Evidence 106, where a party introduces all or part of a recorded statement, an adverse party may require the introduction of any other part that 'in

---

[13] Indeed, the only information the jury received on this subject came from a flagrantly improper argument in Plaintiff's counsel's summation, when he told the jury that "Social Security Disability benefits are temporary benefits. He got temporary benefits following the 2007 accident. Temporary." (Tr. (Dkt. No. 67) at 92)

fairness ought to be considered at the same time.'" United States v. Coplan, 703 F.3d 46, 84-85 (2d Cir. 2012) (quoting Fed. R. Evid. 106). "The rule of completeness provides that 'even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" United States v. Kopp, 562 F.3d 141, 144 (2d Cir. 2009) (quoting United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007), and citing Fed. R. Evid. 106).

"Underlying Rule 106 . . . is a principle of fairness requiring the introduction of an entire or related document if necessary for the 'fair and impartial understanding of the admitted portion' or document." Phoenix Associates III v. Stone, 60 F.3d 95, 102 (2d Cir. 1995) (quoting United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982)). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Marin, 669 F.2d at 84. "The trial court's application of the rule of completeness is reviewed for abuse of discretion." Johnson, 507 F.3d at 796 (citing United States v. Jackson, 180 F. 3d 55, 73 (2d Cir. 1999)).

"[P]rior consistent statements can be introduced to rehabilitate the credibility of a witness who has been impeached by a prior inconsistent statement." Phoenix Associates III, 60 F.3d at 103 (citing United States v. Khan, 821 F.2d 90, 94 (2d Cir. 1987); United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986)). However, "not every prior consistent statement has much force in rebutting the effect of a prior inconsistent statement, and the issue ought to be whether the particular consistent statement sought to be used has some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." Pierre, 781 F.2d at 331. A prior consistent statement may be admissible where it

"diminish[es] the likelihood that the witness had made the inconsistent statement attributed to him," see id. (citing United States v. Corry, 183 F.2d 155 (2d Cir. 1950); Stewart v. People, 23 Mich. 63, 74 (1871)), and when the "statement [is] offered to clarify or amplify the meaning of the impeaching inconsistent statement." Id. (citing United States v. Fayette, 388 F.2d 728, 733-35 (2d Cir. 1968); United States v. Lev, 276 F.2d 605, 608 (2d Cir. 1960); United States v. Weinbren, 121 F.2d 826, 828-29 (2d Cir. 1941)). "When a prior consistent statement tends to cast doubt on whether the prior inconsistent statement was made, its use for rehabilitation lies within the sound discretion of a trial court." United States v. Santiago, 199 F. Supp. 2d 101, 107 (S.D.N.Y. 2002) (citing United States v. Castillo, 14 F.3d 802, 806 (2d Cir. 1994)).

## B.    Analysis

As discussed above, the Court admitted excerpts of Lopez and Roman's testimony from the SSA hearing because their testimony – concerning the injuries that Plaintiff sustained from the October 30, 2007 accident, and his recovery from those injuries – was inconsistent with their trial testimony.  Plaintiff sought to introduce portions of their SSA hearing testimony – concerning the injuries Plaintiff sustained from the January 24, 2009 accident – that were consistent with their trial testimony.  But prior consistent statements are not admissible to buttress trial testimony, unless to rebut a claim of recent fabrication.  See Fed. R. Evid. 801(d)(1)(B)(i) (a prior consistent statement may be offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying").  There was no claim of recent fabrication in this case, however.

Moreover, the prior consistent statements concerning the 2009 accident injuries were not admissible under the rule of completeness, because the prior inconsistent statements that were admitted concerned the injuries Lopez sustained from the October 30, 2007 accident,

and not the injuries he sustained from the January 24, 2009 accident. See Johnson, 507 F.3d at

796-97 (district court properly excluded portions of confession defendant sought to introduce

because they "did not explain the admitted portion or place [it] in context"); United States v.

Jackson, 658 F.3d 145, 150 (2d Cir. 2011) (district court properly excluded a portion of a tape

recording that did not clarify the portion introduced by the Government).

The Court committed no error in precluding evidence of Plaintiff and Roman's

prior consistent testimony concerning the injuries he sustained from the January 24, 2009

accident.[14]

## IV.    JUDICIAL MISCONDUCT

Plaintiff claims that he is entitled to a new trial because the jury's verdict was

improperly influenced by the Court's improper behavior. Plaintiff claims that the Court made

"numerous accusatory, insulting[,] and sarcastic comments about Plaintiff and his counsel," and

that the Court "repeatedly screamed and insulted counsel for Plaintiff, and attacked counsel's

competence in front of the jury and on the record. . . ." (Pltf. Br. (Dkt. No. 58) at 21-22)

Although Plaintiff claims that the "trial record in this case is replete with partial and biased

conduct and comments by the trial judge" (id. at 21), and that the "full record will confirm that

_____

[14]  To the extent that Plaintiff contends that the Court precluded him from offering prior
testimony concerning Plaintiff's injuries from the 2007 accident (see Pltf. Br. (Dkt. No. 58-1) at
18) – testimony that was necessary to understand the excerpts introduced by Defendant – that
assertion is false. The Court made clear that Plaintiff could seek to introduce prior testimony of
Lopez and Roman concerning the injuries Lopez sustained in the October 30, 2007 accident.
(Tr. (Dkt. No. 61) at 46-48; (Dkt. No. 63) at 7-8 ("To the extent you want to introduce statements
about the 2007 incident that are contradictory to statements that Ms. Snitily introduces, then
obviously you're free to do that. To the extent you want to introduce consistent statements about
the 2009 incident, that's a problem.") Plaintiff did not seek to introduce any such excerpts
concerning the 2007 accident.

the trial judge acted like a second attorney for Defendant" (id.), Plaintiff provides no citations to any pages of the trial transcript.

A.   **Legal Standards**

"Although [the Second Circuit] ha[s] repeatedly observed that due process requires a fair trial rather than a perfect trial, a court must strive for 'that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding.'" Santa Maria v. Metro-North Commuter R.R., 81 F. 3d 265, 273 (2d Cir. 1996) (quoting Glasser v. United States, 315 U.S. 60, 82 (1942)) (internal citations omitted). "Indeed, '[a] trial judge must be especially cautious and circumspect in language and conduct during a jury trial.'" Id. (quoting Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc., 818 F.2d 1398, 1401 (8th Cir. 1987)). "A trial court may ask questions for such purposes as 'clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings.'" United States v. Messina, 131 F.3d 36, 39 (2d Cir. 1997) (quoting United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996)). "And, it 'may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side.'" Id. (quoting Filani, 74 F.3d at 385).

As noted by the Supreme Court,

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune.

31

Liteky v. United States, 510 U.S. 540, 555-56 (1994) (emphases in original).

   "[T]he standard for a new trial based on judicial misconduct [therefore] is extremely high, and the moving party must demonstrate that 'the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality.'" Ullman, 152 F. Supp.2d at 326 (quoting Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995)). "To determine whether there was judicial bias, a court should 'examine the entire record and attempt to determine whether the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this has become a factor in the determination of the jury.'" Id. (quoting United States v. Guglielmini, 384 F.2d 602, 605 (2d Cir. 1967)).

**B.** **Analysis**

   The Court has read the entire transcript and has provided page citations for every factual statement in this Opinion. In other words, it conducted the review that Plaintiff's counsel was ordered to perform in connection with his new trial motion (Dkt. No. 56), but refused to perform. The Court's review reveals no biased conduct, no "accusatory, insulting, or sarcastic comments," no screaming, and no attacks on Plaintiff's counsel's competence.

   As noted above, Plaintiff has provided no transcript citations for the charges of bias and impartiality that he levels against the Court. Indeed, the only reference Plaintiff's counsel makes to the trial transcript (see Pltf. Br. (Dkt. No. 58-1) at 21-22) involves argument concerning his tardy in limine motion – filed Sunday at midnight before the Monday trial date. Colloquy concerning Plaintiff's motion in limine took place before the trial started. Indeed, it took place before jury selection had even begun. (See Pltf. Br., Ex. L (June 24, 2013 transcript excerpt) (Dkt. No. 58-12); Tr. (Dkt. No. 61) at 2-4, 7, 15-16, 19, 22-23)

A review of the transcript once the trial began reveals the following: Although Plaintiff's counsel Matthew A. Peluso states that the Court exhibited "blatant personal bias against, and hostile treatment of, Plaintiff [and Roman]," and acted "like a second attorney for Defendant by cross-examining Plaintiff [and Roman]" (Pltf. Br. (Dkt. No. 58-1) at 6-7), Plaintiff's counsel's direct examination of Plaintiff was interrupted by only one question from the Court (see Tr. (Dkt. No. 61) at 89-117; (Dkt. No. 63) at 11-33), which concerned the direction Plaintiff was facing when he was hit. (Tr. (Dkt. No. 61) at 107) Plaintiff's counsel commented that "the judge makes a good point." (Id.) Many of defense counsel's objections during Plaintiff's direct examination were overruled. (Id. at 111; Tr. (Dkt. No. 63) at 15, 19, 31)

The Court asked no questions during Plaintiff's direct examination of Roman. (Tr. (Dkt. No. 63) at 169-79) The Court did ask Roman questions at one point on cross-examination concerning Lopez's physical condition in 2008 (id. at 189-91), because she had testified that she had no recollection of matters that it seemed likely she would recall, such as the SSA disability claim she completed for Lopez, and whether Lopez could work in 2007. (Id. at 181-82, 193) The Court's questioning was not extended and was not improper in any way. The Court asked Ramdhani and Dr. Marc Cohen – Plaintiff's other witnesses – no questions. In short, Plaintiff's examinations were not in any way impeded by the Court.

A review of the trial transcript also reveals many instances in which defense counsel's objections were overruled (Tr. (Dkt. No. 61) at 81, 111; Tr. (Dkt. No. 63) at 15, 19, 31, 130, 146-47, 151, 161, 168, 212; Tr. (Dkt. No. 65) at 19, 30, 53), and Plaintiff's counsel's objections were sustained. (Id. (Dkt. No. 63) at 141-42, 188-189, 193; Tr. (Dkt. No. 65) at 45-47, 118-21, 138)) The trial transcript also reveals that Mr. Peluso obtained jury instructions that

he sought.  (Tr. (Dkt. No. 65) at 145; (Dkt. No. 67) at 6, 7, 14-15)  In short, the trial transcript reveals no bias in terms of the Court's rulings.

Plaintiff has also submitted a "Certification from Donna Roman Hernandez." (Pltf. Br., Ex. I (Dkt. No. 58-10))[15]  Roman states that while she was waiting to testify on June 25, 2013, she was

> seated outside of the courtroom in the common area accessible to both witnesses and members of the jury.  While in this waiting area, I could personally hear someone yelling inside the courtroom, even though the double-door to the courtroom was closed.  As I continued to listen to this yelling, I was able to determine that it was the judge yelling at counsel for Plaintiff, Matthew A. Peluso, Esq.  While this yelling was going on, members of the jury came out from the jury room into the waiting area and went to the restrooms, water fountains and elevators.  Although I cannot speculate what the juror[]s did or didn't hear, the yelling coming from the courtroom was clearly audible. . . . After my testimony was done, I again sat outside the courtroom and heard another occasion when the judge was yelling at Mr. Peluso even through the closed doors.  Given the volume of the yelling I heard, it clearly must have been even louder inside the courtroom.

(Id., ¶¶ 3-5, 8)

As an initial matter, Roman is wrong about some basic facts.  The trial took place in Courtroom 705 at 40 Foley Square.  The jury room is not open to the public, and members of the jury do not use the restrooms in the public hallway outside the courtroom, because there are restrooms adjacent to the jury room.  Accordingly, there were no jurors milling about in "the waiting area [using] the restrooms, water fountains[,] and elevators."  (Id. at ¶ 5)

Because Roman does not say what she allegedly heard being said in the courtroom, it is impossible to know what she is referring to.  Testimony on the afternoon of June 25, 2013 – when Roman testified – was not controversial, however.  Dr. Marc Cohen testified; defense counsel completed her cross-examination of Lopez – asking him four questions – and

---

[15]  Roman identified herself at trial as "Donna Roman."  (Tr. (Dkt. No. 63) at 169).  The reason for the name change on her "Certification" is not explained.

Jeanine Ramdhani testified. (Tr. (Dkt. No. 63) at 99-168) The examinations of these witnesses proceeded without interruption by the Court, and with little colloquy with the lawyers.[16]

Roman also contends that "[w]hile on the stand, the judge cross-examined me in a hostile and clearly biased manner, which left no doubt in my mind that he was trying to impeach and attack my personal credibility." (Pltf. Br., Ex. I (Dkt. No. 58-10) ¶ 7) "It was clear that the judge was biased against Plaintiff and his positions in this case, and was questioning me in a way to support the Defendant's strategy in this case." (Id.)

As noted above, the Court asked no questions of Roman during her direct examination. (Tr. (Dkt. No. 63) at 169-79) As to the cross-examination, the Court asked a question only after Roman – who had repeatedly asserted at Lopez's SSA disability claim hearing that he "could not have worked" after the October 30, 2007 accident (DX N) – repeatedly refused to address Lopez's condition after the 2007 accident and his disability claim premised on injuries sustained in that accident, which she had prepared. (Id. at 180-89)

It was in this context that the Court asked, "[d]id [Lopez] ever tell you in 2008 that he couldn't stand or sit for long periods of time because of pain?" (Id. at 189) After Roman testified, "I do not recall the dates," the Court asked, "in 2008 did he ever tell you that he couldn't drive because of the pain in his back?" (Id.) When Roman repeated, "I could not give

---

[16] Roman also asserts that "[a]fter [her] testimony was done, I against sat outside the courtroom and heard another occasion when the judge was yelling at Mr. Peluso." (See Pltf. Br., Ex. I (Dkt. No. 58-10)) This assertion is likewise not supported by the trial transcript. Roman was Plaintiff's last witness, and she finished her testimony at the end of the trial day on June 25, 2013. (Tr. (Dkt. No. 63) at 213) The jury was sent home. The trial transcript contains a dozen pages of colloquy after Roman completed her testimony. Nothing controversial is discussed in these pages. The Court requested briefing on certain evidentiary issues; asked defense counsel what witnesses she intended to call; stated that it would rule on objections to Dr. Lastig's videotaped deposition; discussed the admissibility of certain medical records, and told defense counsel that the records would not be admitted en masse; and scheduled a charge conference. (Id. at 213-27) None of these subjects provoked heated discussion.

35

you dates," the Court made clear that it was "not asking [Roman] to tell me a date. I'm asking you for a year. The year I'm asking you is 2008." (Id.) Roman was not able to recollect whether in 2008 Lopez had complained about a pain in his back while driving. (Id. at 190) The Court then asked whether Lopez had told Roman "that he couldn't lift any objects in 2008?" (Id.) Roman testified that he might have made such a statement "close in time to the 2007 injury," but not in 2008, because "[h]e improved." (Id. at 190-91) Roman also told the Court that she could not recall any conversation with Lopez about the October 30, 2007 accident. (Id. at 192) The Court asked no other questions of Ms. Roman.

There was nothing improper in the Court's questioning of Roman. The Court was attempting to clarify Roman's vague and uncertain testimony as to a critical issue in the case: Lopez's condition after the 2007 accident. A judge's attempt to clarify a witness's testimony as to a critical issue at trial is not error. See United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996) ("questions . . . designed simply to clarify testimony" are not improper) (citing United States v. Switzer, 252 F.2d 139, 144-145 (2d Cir. 1958)); Ullman, 152 F. Supp. 2d at 327 (finding no partiality or bias when plaintiff did not directly answer court's question, requiring follow up questions). Moreover, although Roman was able to recall at trial almost nothing about Lopez's condition after the October 30, 2007 accident and the disability claim she prepared for him premised on injuries sustained in that accident, when she testified at the SSA hearing, Roman had had no difficulty recalling details concerning Lopez's condition after the 2007 accident. See DX N.

As the Court said in admitting Roman's prior inconsistent testimony from the SSA disability claim hearing,

> [s]he's an important witness. Her credibility is very much at issue. Critical, actually. . . . I think her credibility is very much in issue. She's given important testimony. It appears

36

to me that [her testimony at the SSA hearing] is inconsistent, flatly inconsistent with what she just testified to, so it clearly goes to her credibility.

(Tr. (Dkt. No. 63) at 196)[17]

   To the extent that Plaintiff and Roman complain about the tone of the Court's

questions, throughout the trial the Court took care to ensure that the jury drew no inference from

its questions and statements:

> You must not take anything I say or do during the trial as indicating what your verdict should be. (Tr. (Dkt. No. 61) at 68);

> Any opinion I might have regarding the facts is of absolutely no consequence. (Tr. (Dkt. No. 67) at 100);

> [A]ny statements or rulings I have made during the trial are not any indication of my views of what your decision should be. The decision here is for you alone. (Id. at 104);

> From time to time I asked witnesses questions. You should draw no inference from that. My questions were only intended for clarification or to expedite matters and were not intended to suggest any opinion on my part as to whether any witness was more or less credible than any other witness or any view as to what your verdict should be. (Id. at 103)

   "[J]uries are presumed to follow the court's instructions." CSX Transp., Inc. v.

Hensley, 556 U.S. 838, 841 (2009); see also United States v. Pforzheimer, 826 F.2d 200, 205 (2d

Cir. 1987) ("It is a fundamental proposition that a jury is presumed to follow the instructions of

the trial judge."), and there is no reason to believe that the jurors did not do so here.

   In sum, the Court's brief questioning of Roman did not unfairly prejudice Plaintiff

nor did it lead to a "miscarriage of justice."

   Finally, with respect to Plaintiff's claim that "[t]he trial record is replete with

partial and biased conduct and comments by the trial judge, including numerous accusatory,

---

[17] The Court's statements concerning Roman were made, of course, outside the presence of the jury. (Id. at 194-96)

insulting, or sarcastic comments about Plaintiff and his counsel in this case. . . . [T]he trial judge
repeatedly screamed and insulted counsel for Plaintiff, and attacked counsel's competence in
front of the jury and on the record. . . ." (Pltf. Br. (Dkt. No. 58-1) at 21-22), there is no such
evidence in the record.

As discussed above, the vast majority of the trial, including Plaintiff counsel's
witness examinations, jury arguments, and colloquy with the Court, proceeded without incident.
There were occasions in which Mr. Peluso strained the patience of the Court, but those issues
were addressed prior to jury selection, at sidebars, or during recesses, and not before the jury.
Mr. Peluso's unprofessional conduct included the following:

> His persistent efforts to hide from the jury the fact that his client – two years before the
> 2009 accident in question – had submitted a disability claim to the SSA premised on a
> 2007 accident that allegedly caused extreme, debilitating pain arising from the same type
> of lower back injury alleged in the instant case. Exclusion of this evidence would have
> amounted to a fraud on the jury.
>
> His filing of a motion in limine at midnight before the Monday, June 24, 2013 trial,
> concerning evidence regarding Plaintiff's Social Security disability claim, when the
> Court's scheduling order had required that motions in limine be filed by January 25, 2013
> (see Order (Dkt. No. 11)), and counsel had been aware of Lopez's disability since at least
> his 2012 deposition. (See Pltf. MIL Br. (Dkt. No. 44); Tr. (Dkt. No. 61) at 16-17)
>
> His failure to provide relevant legal authority for his arguments (see, e.g., Tr. (Dkt. No.
> 61) at 20-27), and his refusal to accept the Court's rulings, which meant that
> straightforward legal rulings were repeated, in some instances, three or four times. (See,
> e.g., id. at 62; Tr. (Dkt. No. 63) at 60)
>
> His repeated refusal to respond to the Court's questions (see, e.g., Tr. (Dkt. No. 61) at 12-
> 14, 27, 33-34, 37), and his frequent interruptions of the Court. (See, e.g., id. at 21, 46-48;
> Tr. (Dkt. No. 63) at 53 ("[P]lease don't interrupt me."))
>
> His degrading habit of referring to his younger, female adversary by her first name, both
> before the Court and before the jury. (See, e.g., Tr. (Dkt. No. 61) at 8, 33, 35, 37, 39, 41,
> 55, 56, 60, 64; Tr. (Dkt. No. 63) at 9, 10, 78, 87, 88, 100, 156, 197, 200, 201, 224, 225;
> Tr. (Dkt. No. 65) at 46, 50, 98, 107, 116, 117, 126, 141; Tr. (Dkt. No. 67) at 14, 20, 21,
> 25, 26, 31) Defense counsel never referred to Mr. Peluso by his first name.

His lack of familiarity with the Federal Rules of Evidence, particularly regarding admissions and the admissibility of prior consistent statements. Mr. Peluso objected on hearsay grounds to statements made by Lopez in connection with his SSA disability claim. (Tr. (Dkt. No. 63) at 183-84) Statements by a party opponent are admissions not subject to the hearsay rule. Fed. R. Evid. 801(d)(2)(A). Mr. Peluso also did not understand that a statement by one's lawyer – within the scope of the representation – constitutes an admission not subject to the hearsay rule. (Tr. (Dkt. No. 61) at 16 ("I don't care what his Social Security lawyer said in her letter.") Peluso argued that Lopez's lawyer's statement was hearsay (id. at 28), even though Fed. R. Evid. 801(d)(2)(D) explicitly states that a statement made by an agent – such as one's lawyer – is not hearsay. Fed. R. Evid. 801(d)(2)(D).

His blatantly improper argument in summation (Tr. (Dkt. No. 67) at 92) that Lopez had received only "temporary" disability benefits when (1) evidence concerning the SSA ALJ's disability benefit determination was excluded at Plaintiff's request (Tr. (Dkt. No. 63) at 4-5); and (2) the assertion was false, because the SSA ALJ found that Plaintiff had been disabled since October 31, 2007, and was entitled to disability benefits from that day forward. (See DX G (March 22, 2011 SSA Notice of Decision))

Mr. Peluso's improper and unprofessional behavior was not, however, addressed before the jury, except as necessary to rule on objections. Plaintiff suffered no unfair prejudice from the Court's conduct of the trial.[18]

---

[18] The cases cited by Plaintiff (Pltf. Br. (Dkt. No. 58-1) at 21) are not to the contrary. In Santa Maria v. Metro-North Commuter R.R., 81 F. 3d 265 (2d Cir. 1996), the Second Circuit granted plaintiff a new trial where the trial judge expressed antipathy to plaintiff's claim; engaged in sarcastic cross-examination; held plaintiff's counsel in contempt for failing to sit down quickly; denied plaintiff's counsel's pro hac vice motion, and ordered local counsel to present the case, and denied local counsel's motion for a continuance to prepare. In Rivas v. Brattesani, 94 F. 3d 802 (2d Cir. 1996), the Second Circuit ruled that the cumulative impact of the district judge's comments resulted in an unfair trial where, inter alia, the judge (1) interrupted defense counsel's line of questioning with "Come off it, will you counsel"; (2) told the jury that defense counsel's questioning was "pretty silly"; and (3) asked the defendant police officer whether his "memo book becomes a fraud that you make up at the end of the day?" Id. at 805, 808. The court concluded that the trial judge's comments "conveyed to the jury the impression that it held a fixed and unfavorable opinion of defendants, their counsel, and their position." Id. at 807. Finally, in United States v. Filani, 74 F. 3d 378 (2d Cir. 1996), the court found inappropriate judicial involvement when the trial judge frequently interrupted the testimony and counsel's questioning (see id. at 382 ("On 16 of the 60 pages of the trial transcript where defendant's testimony appears, his credibility or the theory of his defense were challenged by inquiries from the presiding judge")); intervened in defense counsel's cross-examination of a federal agent and prosecution witness "with a series of follow-up questions that entirely demolished [a] helpful

39

The jury's verdict was the product of overwhelming evidence demonstrating that

(1) Lopez was largely responsible for any injury he suffered on January 24, 2009; (2) Lopez

suffered no serious injury on January 24, 2009; and (3) the back condition about which Lopez

complained was the product of an October 30, 2007 motor vehicle accident, as he told SSA in

2008.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a new trial (Dkt. No. 58) is

denied. The Clerk of Court will terminate the motion and close this case.

Dated: New York, New York
      August 10, 2019

                              SO ORDERED.

                              Paul G. Gardephe
                              United States District Judge

---

concession defense counsel . . . elicited from [the] witness" (id.); "not only corrected a mistake defendant made but scolded him and forced him to admit his error before the jury" (id.); and aggressively interrogated defendant regarding his finances.

As is apparent from the detailed analysis set forth above, no comparable judicial conduct took place at trial in the instant case.